Slip Op. 18-114

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **REBAR TRADE ACTION COALITION,** | |
| **Plaintiff,** | |
| **v.** | **Before: Claire R. Kelly, Judge** |
| **UNITED STATES,** | **Court No. 17-00184** |
| **Defendant,** | **PUBLIC VERSION** |
| **and** | |
| **GRUPO SIMEC ET AL.,** | |
| **Defendant-Intervenors.** | |

## <u>OPINION AND ORDER</u>

[Remanding the U.S. Department of Commerce's final determination in the first administrative review of steel concrete reinforcing bar from Mexico.]

Dated: September 7, 2018

<u>John R. Shane</u> and <u>Maureen Elizabeth Thorson</u>, Wiley Rein, LLP, of Washington, DC, argued for plaintiff, Rebar Trade Action Coalition. With them on the brief was <u>Alan Hayden Price</u>.

<u>Margaret Joy Jantzen</u>, Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With her on the brief were <u>Reginald T. Blades, Jr.</u>, Assistant Director, <u>Jeanne E. Davidson</u>, Director, and <u>Chad A. Readler</u>, Acting Assistant Attorney General. Of Counsel on the brief was <u>Kristen McCannon</u>, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

<u>Rosa S. Jeong</u>, Greenberg Traurig, LLP, of Washington, DC, argued for defendant-intervenors, Grupo Simec; Orge S.A. de C.V.; Compania Siderurgica del Pacifico S.A. de C.V.; Grupo Chant S.A.P.I. de C.V.; RRLC S.A.P.I. de C.V.; Siderurgica del Occidente y Pacifico S.A. de C.V.; Simec International 6 S.A. de C.V.; Simec International 7 S.A. de C.V.; and Simec International 9 S.A. de C.V. With her on the brief was <u>Irwin P. Altschuler</u>.

Kelly, Judge:  This action is before the court on a motion for judgment on the agency record challenging various aspects of the U.S. Department of Commerce's ("Department" or "Commerce") final determination in the first administrative review of the antidumping duty ("ADD") order covering steel concrete reinforcing bar ("rebar") from Mexico.  See [Rebar Trade Action Coalition's] Mot. J. Agency R., Dec. 13, 2017, ECF No. 23; see also Steel Concrete Reinforcing Bar From Mexico, 82 Fed. Reg. 27,233 (Dep't Commerce Sept. 14, 2017) (final results of [ADD] administrative review; 2014–2015) ("Final Results") and accompanying Decision Mem. for the Final Results of [ADD] Administrative Review: Steel Concrete Reinforcing Bar from Mexico; 2014–2015, A-201-844, (June 7, 2017), ECF No. 19-5 ("Final Decision Memo"); Steel Concrete Reinforcing Bar From Mexico, 79 Fed. Reg. 65,925 (Dep't Commerce Nov. 6, 2014) ([ADD] order). Plaintiff, Rebar Trade Action Coalition ("RTAC" or "Plaintiff"), a coalition of domestic producers of the subject merchandise, commenced this action pursuant to section 516A(a)(2)(A)(i)(I) and 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(A)(i)(I) and 1516a(a)(2)(B)(iii) (2012).[1]  See Summons, July 17, 2017, ECF No. 1; Compl., July 24, 2017, ECF No. 9.

Plaintiff challenges three aspects of Commerce's final determination.  See Mem. Pl. [RTAC] Supp. Rule 56.2 Mot. J. Agency R., Dec. 14, 2017, ECF No. 27 ("Pl.'s Br.").[2]

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

[2] The briefs filed in this action contain significant bracketing of information designated as confidential.  The court, having reviewed the briefs and mindful of the need to have readable public opinions, requested that the parties confer and identify the information that could be unbracketed and made public.  See Letter [Requesting Identification Info. to be Unbracketed] at

(footnote continued)

Plaintiff challenges as not in accordance with law and unsupported by substantial evidence Commerce's (i) decision not to collapse six non-rebar producing affiliates of respondent Grupo Simec S.A.B. de C.V. and Orge S.A. de C.V. ("Simec") that owned fixed assets, see id. at 9–17; (ii) application of transactions disregarded and major input rules to adjust the reported costs of the non-collapsed fixed asset owning affiliates of Simec, see id. at 17–26; see also 19 U.S.C. § 1677b(f)(2)–(3); and (iii) decision not to apply total or partial facts available with an adverse inference to Simec.[3] See id. at 26–38.[4]

     For the reasons that follow, the court remands to the agency for further explanation or reconsideration consistent with this opinion Commerce's (i) decision not to collapse six fixed asset owning companies affiliated with Simec, (ii) application of the transactions disregarded and major input rules, (iii) decision not to apply total facts available to Simec, or facts otherwise available to Simec's cost reporting, and (iv) decision not to apply adverse inferences.

---

2–3, June 8, 2018, ECF No. 44.  The parties filed a joint status report complying with the court's request and identifying five terms and concepts that could be unbracketed uniformly throughout the parties' filed submissions.  See Joint Status Report, June 19, 2018, ECF No. 49.  As a result, in this opinion, the court will make public information that may appear bracketed in the briefs filed on the docket of this action and in relevant administrative record documents.

[3] Although 19 U.S.C. § 1677e(a)–(b) and 19 C.F.R. § 351.308(a)–(c) each separately provide for the use of facts otherwise available and the subsequent application of adverse inferences to those facts, parties sometimes use the shorthand "adverse facts available" or "AFA" to refer to its use of such facts otherwise available with an adverse inference.

[4] On September 1, 2017, Defendant submitted indices to the public and confidential administrative records underlying Commerce's final determination.  These indices are located on the docket at ECF No. 19-2–3.  All further references in this opinion to administrative record documents are identified by the numbers assigned by Commerce in these indices.

## BACKGROUND

Commerce initiated this first administrative review covering subject imports entered during the period of review, April 24, 2014 through October 31, 2015. See Initiation of Antidumping and Countervailing Duty Administrative Reviews, 81 Fed. Reg. 736, 737 (Dep't Commerce Jan. 7, 2016). Commerce's review covered respondents Deacero S.A.P.I de C.V., and Grupo Simec S.A.B. de C.V. and Orge S.A. de C.V. Id.

In its final determination, as it had done in its preliminary determination, Commerce collapsed Grupo Simec S.A.B. de C.V., Orge S.A. de C.V., Compania Siderurgica del Pacifico S.A. de C.V., Grupo Chant S.A.P.I. de C.V., RRLC S.A.P.I. de C.V., Siderurgica del Occidente y Pacifico S.A. de C.V., Simec International 6 S.A. de C.V., Simec International 7 S.A. de C.V., and Simec International 9 S.A. de C.V. ("Grupo Simec" or the "collapsed group"), and determined that the companies should be treated as a single entity because record evidence showed that there was a significant potential for manipulation of price or production. See Final Decision Memo at 31–32; Final Results, 82 Fed. Reg. at 27,234 n.10; Steel Concrete Reinforcing Bar From Mexico, 81 Fed. Reg. 89,053, 89,053 n.5 (Dep't Commerce Dec. 9, 2016) (preliminary results of [ADD] administrative review; 2014–2015) ("Prelim. Results") and accompanying Decision Mem. for the Prelim. Results of [ADD] Administrative Review: Steel Concrete Reinforcing Bar from Mexico; 2014–2015 at 3–4, A-201-844, PD 127, bar code 3527282-01 (Dec. 5, 2016). Commerce, however, rejected RTAC's argument that six other Simec affiliates that owned fixed assets, but were not producers of the subject merchandise, should also have been collapsed. See Final Decision Memo at 31–32. For the Final Results, Commerce continued to calculate a weighted-average dumping margin of 0.56% for

Deacero S.A.P.I de C.V. and 0.00% for Grupo Simec S.A.B. de C.V., as it had done in its preliminary determination.  See Final Results, 82 Fed. Reg. at 27,234; Prelim. Results, 81 Fed. Reg. at 89,053.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c), which grant the court authority to review actions contesting the final determination in an administrative review of an antidumping duty order.  The court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]"  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

I.   **Commerce's Decision Not to Collapse the Non-Producers**

Plaintiff challenges Commerce's decision not to collapse six companies that were affiliated with Simec, the parent company, and owned fixed assets used to produce the subject merchandise at issue here, but were themselves non-producers.  See Pl.'s Br. at 9–17.  Defendant argues that Commerce's determination is in accordance with law and is supported by substantial evidence because Commerce does not have a practice of collapsing non-producers that own fixed assets and, even if it did, the six non-collapsed fixed asset owning companies did not have a significant potential to manipulate price or production.  See Def.'s Resp. Pl.'s Mot. J. Agency R. at 11–14, Mar. 7, 2018, ECF No. 30 ("Def.'s Resp. Br."); see also 19 C.F.R. § 351.401(f).[5]  For the following reasons, Commerce's decision not to collapse is not in accordance with law and is not supported

---

[5] Further citations to Title 19 of the Code of Federal Regulations are to the 2016 edition.

by substantial evidence, and is remanded to the agency for further explanation or

reconsideration consistent with this opinion.

Commerce's regulation permits it to

> treat two or more affiliated producers as a single entity where those producers have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities and [Commerce] concludes that there is a significant potential for the manipulation of price or production.[6]

19 C.F.R. § 351.401(f)(1). In assessing whether there is a "significant potential for the

manipulation of price or production," Commerce may consider:

> (i) The level of common ownership;

> (ii) The extent to which managerial employees or board members of one firm sit on the board of directors of an affiliated firm; and

> (iii) Whether operations are intertwined, such as through the sharing of sales information, involvement in production and pricing decisions, the sharing of facilities or employees, or significant transactions between the affiliated producers.

19 C.F.R. § 351.401(f)(2).

Although Commerce's collapsing regulation speaks of treating two or more

affiliated producers as a single entity, Commerce has developed a practice of collapsing

non-producers with affiliated producers of subject merchandise if the non-producers meet

the factors set out in 19 C.F.R. § 351.401(f)(2). See [Commerce's] Affiliation & Collapsing

Mem. for the Grupo Simec at 6, 6 n.26, PD 131, bar code 3528081-01 (Dec. 5, 2016)

("Prelim. Collapsing Memo") (providing citations to prior final determinations issued by

---

[6] If affiliated producers are collapsed, those companies may be considered a single entity. Collapsing entities allows sales of one collapsed entity to be considered sales of the other for purposes of Commerce's dumping margin calculation. See 19 C.F.R. § 351.401(f)(1); 19 U.S.C. § 1675(a)(2)(A)(ii); 19 U.S.C. § 1677b(a).

Commerce applying the 19 C.F.R. § 351.401(f)(2) criteria to determine whether non-producers should be collapsed and describing the regulatory criteria as "instructive"); see, e.g., Issues and Decision Mem. for the [ADD] Investigation of Certain Frozen and Canned Warmwater Shrimp from Brazil at 14, A-351-838, (Dec. 23, 2014), available at https://enforcement.trade.gov/frn/summary/brazil/04-28110-1.pdf (last visited Sept. 4, 2018).  Commerce may deviate from a prior practice as long as it explains why doing so is justified under the circumstances.  See Save Domestic Oil, Inc. v. United States, 357 F.3d 1278, 1283–84 (Fed. Cir. 2004).

In the final determination, Commerce explains that it did not collapse the six fixed asset owning companies because they are not producers of the subject merchandise and that nothing on the record contravenes that conclusion.  See Final Decision Memo at 32; see also [Simec's] Fifth Suppl. Questionnaire Resp. at Ex. S5-1, CD 179, bar code 3524835-01 (Nov. 22, 2016) ("Fifth Suppl. Questionnaire Resp.") (listing nine fixed asset owning companies affiliated with Simec; six of which were not collapsed).  Instead, the six companies owned fixed assets, i.e., the facilities and production equipment, and leased those fixed assets to the collapsed companies to produce the subject merchandise.[7]  See [Commerce's] Final Results Sales & Cost Analysis Memo at 2, CD 237, bar code 3579897-01 (June 7, 2017) ("Final Calc. Memo"); Final Decision Memo at 32.  According to Commerce, because the facilities and the production equipment used to produce the subject merchandise were leased, the six fixed asset owners did not have access to the fixed assets and did not meet the requirements for collapsing.  See Final Decision Memo at 32; Final Calc. Memo at 2.

---

[7] The leases were provided at [[          ]].  See Final Calc. Memo at 2.

Commerce failed to explain why it did not use the 19 C.F.R. § 351.401(f)(2) criteria to determine whether the six non-producing fixed asset owning companies should be collapsed.  In the preliminary collapsing memorandum, Commerce asserts that it has applied 19 C.F.R. § 351.401(f) to non-producers in the past to determine whether collapsing is warranted.  See Prelim. Collapsing Memo at 6.  In the final determination, however, Commerce states that "[its] practice is to collapse producers of subject merchandise and prevent the manipulation of price or production[,]" and cites to the preliminary collapsing memorandum as support.  Final Decision Memo at 31 (citing Prelim. Collapsing Memo at 7).  Commerce has not offered an explanation for why it deviated from its practice of incorporating the criteria of 19 C.F.R. § 351.401(f) into its analysis of whether non-producers should be collapsed.  If Commerce is going to deviate from its practice, it must acknowledge it is doing so and explain why it is reasonable to do so.  See Save Domestic Oil, Inc., 357 F.3d at 1283–84.  Therefore, Commerce's determination is not in accordance with law.

Commerce's decision is also unsupported by substantial evidence.  Commerce's only explanation for its determination is that the fixed asset owners lacked access to the assets, and therefore could not produce the subject merchandise.[8]  See Final Calc. Memo

---

[8] Defendant-Intervenors argue that Commerce engaged in the collapsing analysis, without explicitly referring to the individual factors of 19 C.F.R. § 351.401(f)(2).  See Def.-Intervenors' Resp. Br. Opp'n Pl.'s Mot. J. Agency R. at 11–13, Mar. 8, 2018, ECF No. 34 ("Def.-Intervenors' Resp. Br."); Oral Arg. at 00:38:00–00:42:23.  However, the final determination and the final calculation memorandum only conclude that the existence of a lease means that the production equipment cannot be used by different entities at the same time and therefore collapsing is unwarranted.  See Final Decision Memo at 32; Final Calc. Memo at 2.  Therefore, it is not reasonably discernable that Commerce engaged in the collapsing analysis using 19 C.F.R. § 351.401(f)(2) criteria for the companies in the non-collapsed group.

at 2; Final Decision Memo at 32.[9]  However, given the cost of the lease arrangements[10]

and the fact that the leases themselves are not on the record, it is not reasonably

discernable what record evidence Commerce relied upon to reach its determination.[11]

However, there is record evidence indicating that the companies leasing the facilities and

production equipment and the companies receiving the benefits of these leases are all

virtually wholly owned by Simec, the parent company.  See [Simec's] Sec. A Resp. at

Exs. A-2a–c, PD 17, bar code 3443882-01 (Feb. 22, 2016).  There is also evidence on

the  record  indicating  that  at  least  [[

        ]] were[[            ]] shareholders of two, separate Simec affiliated companies,

both collapsed.  See Fifth Suppl. Resp. at Ex. S5-7.[12]  There is also record evidence that

the non-collapsed and collapsed companies engaged in the same kinds of intercompany

transactions that Commerce noted as indicative of intertwining operations when analyzing

---

[9] Defendant argues that even if, as Plaintiff claims, the [[          ]] leases evidenced a "close
relationship" between the six fixed asset owning companies and the companies in the collapsed
group and created the potential for manipulation, Commerce accounted for this issue by applying
the transactions disregarded and major input rules of 19 U.S.C. § 1677b(f)(2)–(3).  Def.'s Resp.
Br. at 14 (quoting Pl.'s Br. at 16); see also 19 U.S.C. § 1677b(f)(2)–(3).  Defendant's explanation
is unpersuasive because it is a post-hoc rationalization, not relied upon by Commerce, and the
transactions disregarded and major input rules are distinct from Commerce's collapsing analysis
pursuant to 19 C.F.R. § 351.401(f)(1)–(2).

[10] The leases were provided at [[          ]].  See Final Calc. Memo at 2.

[11] Defendant's argument that 19 C.F.R. § 351.401(f)(2) requires a significant potential for control,
and not just the mere possibility of control, see Def.'s Resp. Br. at 11–13, does not excuse
Commerce's failure to conduct an analysis as provided for under the regulation and adopted by
Commerce through practice, of whether the relationship between the collapsed and non-collapsed
companies created a significant potential for the manipulation of price or production.

[12] In response to Commerce's question to provide a list of shareholders of rebar producing
companies, see Fifth Suppl. Questionnaire Resp. at 4–5, Simec produced exhibit S5-7, which lists
[[                    ]], [[                              ]] as the
[[               ]] shareholder of [[                    ]], a collapsed company, and [[
                    ]], [[                              ]] as the
[[          ]] shareholder of [[                              ]], a collapsed company. See
id. at Ex. S5-7.

whether the companies in the collapsed group should be collapsed,[13] see Prelim. Collapsing Memo at 8, and the existence of which suggests that the operations of the non-collapsed and the collapsed groups are likewise intertwined.  See, e.g., [Simec's] Sec. A, B, & D Suppl. Questionnaire Resp. at Ex. D-26A, CD 133, bar code 3504495-02 (Sept. 7, 2016) ("Second Suppl. Questionnaire Resp.").  Further, there is record evidence that the senior board management of the collapsed companies that owned fixed asset owning companies overlapped with companies that were collapsed, but did not own assets.  See Prelim. Collapsing Memo at 8 (citations omitted).  Commerce does not address the senior management structure of the non-collapsed group in the final determination, and no party directs the court to record evidence of the non-collapsed group's individual senior board management.  There is also no evidence on the record supporting the contention that the non-collapsed group could not have manufactured the subject merchandise.  Commerce must explain why its determination not to collapse the six fixed asset owning companies is reasonable in light of the evidence that detracts from its determination, namely: the legal corporate structure of Simec, the cost of the leases, and record evidence of the pervasive ownership of all the subsidiaries by Simec.  See Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951) (noting that "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.").  Commerce has not explained why its determination is reasonable on this record, and therefore, its determination is unsupported by substantial evidence.

---

[13] In the preliminary collapsing memorandum, Commerce notes that the financial statements of some of the collapsed companies record 〖                                        〗 between the collapsed companies.  Prelim. Collapsing Memo at 8 (citing Second Suppl. Questionnaire Resp. at Ex. D-26A).

## II.   Commerce's Application of the Transactions Disregarded and Major Input Rules

Plaintiff challenges Commerce's decision to adjust the costs incurred by the non-collapsed fixed asset owning companies by relying on the books and records of Grupo Simec and of certain collapsed fixed asset owners, as not in accordance with law and unsupported by substantial evidence.[14]   See Pl.'s Br. at 20–26.   Defendant argues that Commerce properly adjusted the costs of the non-collapsed fixed asset owning companies given that the non-collapsed affiliates' financial statements were not on the record.   See Def.'s Resp. Br. at 14–17.   For the reasons that follow, the court remands Commerce's application of the transactions disregarded and major input rules to the agency for further explanation or reconsideration consistent with this opinion.

In the calculation of normal value, Commerce may revise prices between affiliates using the transactions disregarded and major input rules, if Commerce determines that the reported prices are below market value.   See 19 U.S.C. § 1677b(f)(2)–(3); 19 C.F.R. § 351.401(b).   Pursuant to the transactions disregarded rule, Commerce may disregard transactions between persons found to be affiliated for purposes of calculating costs of production "if, in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration."   19 U.S.C. § 1677b(f)(2).   In applying the transactions disregarded rule, Commerce's practice is to

---

[14] For the final determination, Commerce relied on the financial experience of[[      ]] fixed asset owning companies to estimate the general and administrative expense ratio of the six non-collapsed fixed asset owners.   Final Calc. Memo at 3; Final Decision Memo at 32–33.   The [[      ]] companies were[[

                                                                      ]].   See Fifth Suppl. Questionnaire Resp. at Ex. S5-1.   However, to calculate the financial expense ratio of the non-collapsed group, Commerce relied on the consolidated financial records of Grupo Simec.   Final Calc. Memo at 3.

adjust the transfer price for the service or input at issue so that it reflects the market price.

See, e.g., Issues & Decision Mem. for the Final Affirmative Determination in the Less than Fair Value Investigation of Certain Cold-Rolled Steel Flat Products from Brazil at 38, A-351-843, (July 20, 2016), available at http://ia.ita.doc.gov/frn/summary/brazil/2016-17951-1.pdf (last visited Sept. 4, 2018) (explaining that Commerce has an "express preference for market value" and will look to "any reasonable source for market value" if respondent's own purchases or an affiliate's sales are not available (citations omitted)); Issues and Decision Mem. for the Final Affirmative Determination in the Less than Fair Value Investigation of Certain Cold-Rolled Steel Flat Products from the United Kingdom at 28, A-412-824, (July 20, 2016), available at http://ia.ita.doc.gov/frn/summary/uk/2016-17940-1.pdf (last visited Sept. 4, 2018) (adjusting the price paid for the inputs to include the acquisition cost the affiliate paid to the unaffiliated entity, plus the selling, administrative, and general costs of the affiliate); Issues & Decision Mem. for the Final Determination of the Less-Than-Fair-Value Investigations of Certain Steel Nails from Malaysia at 20–22, A-557-816, (May 13, 2015), available at http://ia.ita.doc.gov/frn/summary/malaysia/2015-12250-1.pdf (last visited Sept. 4, 2018) (adjusting the transfer price to reflect the market values on the record); Stainless Steel Round Wire from Canada, 64 Fed. Reg. 17,324, 17,335 (Dep't Commerce Apr. 9, 1999) (notice of final determination of sales at less than fair value) (adjusting transfer price between affiliates to reflect market price).  Pursuant to the major input rule, if the affiliated-party transaction involves the production of a major input to the merchandise, Commerce "may determine the value of the major input on the basis of information available regarding [the] costs of production," if the cost for the input is greater than determined

using the transactions disregarded rule.  <u>See</u> 19 U.S.C. § 1677b(f)(3).  Further, the

agency will normally determine the value of a major input by the higher of the price paid,

the market price, or the cost of producing it.  <u>See</u> 19 C.F.R. § 351.407(b).

In the final determination, Commerce concludes that the six non-collapsed fixed

asset owning companies provided services to Grupo Simec at below-market rates.  <u>See</u>

Final Decision Memo at 32.  Commerce, therefore, revised the general and administrative

expenses ("G&A"), reported fixed overhead costs, and financial expenses of the cost data

pursuant to 19 U.S.C. § 1677b(f)(2)–(3).  <u>See id.</u> at 29–30, 32–33; Final Calc. Memo at

2–3.  To revise the G&A expense ratio for the non-collapsed fixed asset owners,

Commerce relied on the financial records of certain fixed asset owning companies that

were collapsed and make up the entity, Grupo Simec.  <u>See</u> Final Calc. Memo at 3, Attach.

1.  To revise the financial expense ratio for the non-collapsed fixed asset owners,

Commerce relied on the consolidated financial expense ratio of Grupo Simec.  <u>Id.</u>

Commerce then revised the fixed overhead costs reported at the five plants that produced

rebar, by adding the resulting estimates for G&A and financial expenses.  <u>Id.</u> at 2–3.

Defendant argues that Commerce's decision was reasonable because the collapsed fixed

asset owning companies were good comparators for the cost experiences of the

companies in the non-collapsed group.  <u>See</u> Def.'s Resp. Br. at 15–16.

In the final determination, Commerce does not explain why it relied on the cost

experiences of certain collapsed fixed asset owning companies to revise the costs of the

non-collapsed group, and Defendant's explanation is a post hoc rationalization of

Commerce's selection.  Further, even if it was reasonably discernable that Commerce

relied on the cost experiences of certain collapsed fixed asset owners because they

served as good comparators for the cost experiences of the non-collapsed companies, that explanation is not supported by the record.   Commerce does not identify record evidence demonstrating that the cost experiences of the companies in the collapsed group that owned fixed assets were similar to those of the companies in the non-collapsed group, and finds similarity based solely on the fact that the two groups owned fixed assets.[15]   However, the record reveals that the costs incurred by the non-collapsed asset owners are distinct in important ways from those of the collapsed-fixed asset owners.[16] The record does not provide the financial statements for the six non-collapsed fixed asset owning companies.   The final determination does not explain how, in light of record evidence demarcating the differences in the cost experiences of the collapsed and non-collapsed fixed asset owning companies, Commerce reached its determination. Therefore, Commerce's determination is not supported by this record and is remanded to the agency for further explanation or reconsideration consistent with this opinion.

The Defendant-Intervenors argue that Plaintiff's challenge to Commerce's application of the transactions disregarded and major input rules is "factually inaccurate" because Commerce had the necessary information it needed to make the adjustments to the cost data.   See Def.-Intervenors' Resp. Br. Opp'n Pl.'s Mot. J. Agency R. at 18, Mar. 8, 2018, ECF No. 34.   More specifically, the Defendant-Intervenors argue that "the

---

[15]   Defendant, likewise, does not identify record evidence supportive of Commerce's determination, reiterates that it was reasonable for Commerce to use as comparators the [[      ]] collapsed companies that owned fixed assets, and argues that no record evidence undermines Commerce's position.   See Def.'s Resp. Br. at 15–16.

[16]   For example, record evidence shows that in the Mexicali and Guadalajara plants the non-collapsed fixed asset owning companies took on the [[            ]] of the depreciation expenses in those plants.   See Fifth Suppl. Resp. at Ex. S5-1, Ex. S5-2.   However, Commerce's cost adjustments to the non-collapsed group rely on data from the collapsed asset owners who took on the [[                                    ]].   See Final Calc. Memo at 2–3, Attach. I.

financial results of the Non-Producing Asset Owners" were consolidated, and cite to several record documents as support.[17]  Id. (citing [Simec's] Fourth Suppl. Questionnaire Resp. at Exs. S4-2–3, CD 162, bar code 3520897-01 (Nov. 7, 2016); Sec. A Resp. at Ex. A-6b at 11).   In the final determination, Commerce cites Exhibit S4-2 as part of its explanation for why Simec's revised reporting methodology was reasonable and results in a reliable G&A expense ratio.  See Final Decision Memo at 30–31.  Plaintiff, however, challenges the data contained in that exhibit and others cited by the Defendant-Intervenors as omitting costs of some of the non-collapsed fixed asset owners, and as unreliable without the corroboration of individual financial statements of the non-collapsed fixed asset owning companies.  See Reply Br. Pl. [RTAC] at 12–13, 12 n.5, Apr. 11, 2018, ECF No. 35 ("Pl.'s Reply Br.").  However, even if Grupo Simec's consolidated financial statements fully capture the G&A expenses of all six non-producing fixed asset owners, it is not reasonably discernable why Commerce adjusted the G&A calculations for the non-collapsed group based on the cost experiences of certain collapsed fixed asset owning companies, instead of relying on expenses provided in the company wide consolidated statements.  See Final Calc. Memo at 2; Final Decision Memo at 32.

---

[17] Both the Defendant and the Defendant-Intervenors challenge Plaintiff's argument that Commerce's calculations did not include the depreciation expenses of the six non-collapsed fixed asset owning companies.  See Def.'s Resp. Br. at 16–17; Def.-Intervenors' Resp. Br. at 18–19; see also Pl.'s Br. at 23–25.  In its reply, however, Plaintiff explains that in light of the responsive briefs filed in this action it acknowledges that Commerce's final calculations do reconcile the depreciation expenses [[                                        ]], and not just the [[        ]] collapsed fixed asset owning companies.  See Reply Br. Pl. [RTAC] at 9 n.4, Apr. 11, 2018, ECF No. 35.  Nevertheless, Plaintiff maintains its challenge to Commerce's cost adjustment of the depreciation expenses because there is no independent documentation on the record corroborating the financial experiences of the non-collapsed fixed asset owning companies affiliated with Simec.  See id.

Commerce also did not explain why it valued a major input at cost.  The relevant regulation provides that Commerce will value a major input using the higher of the transfer value, market value, or cost.[18]   19 C.F.R. § 351.407(b).   In the final determination, Commerce states that it will apply the transactions disregarded rule, but does not explain why it chose to value the service, i.e., the leases provided by the non-collapsed fixed asset owning companies to the collapsed group to produce the subject merchandise, at cost.  See Final Decision Memo at 32–33; Final Calc. Memo at 2–3.  Accordingly, Commerce's determination is also not in accordance with law and is remanded back to the agency for further explanation or reconsideration consistent with this opinion.

### III.   Commerce's Decision Not to Apply Total or Partial Facts Available

Plaintiff challenges Commerce's decision not to apply total facts available to calculate Simec's dumping margin, or in the alternative, not to apply facts otherwise available to Simec's cost reporting, given that necessary information was missing from the record.  See Pl.'s Br. at 26–31.  Specifically, Plaintiff argues that Simec's reporting methodology delayed the disclosure of information necessary for Commerce to understand Simec's corporate structure and identify all of its affiliated fixed asset owning companies, see id. at 28, and that Simec's reporting methodology obscured Simec's G&A, depreciation, and fixed asset expenses in a way that prevented Commerce from

---

[18] Plaintiff argues that Commerce's valuation should have included profit, and accordingly Commerce should have valued the leases using a market value.  See Pl.'s Br. at 22–23.  The Defendant-Intervenors argue that Commerce is not required to create a "fictitious market" to value the leases, see Def.-Intervenors' Resp. Br. at 19–21, and Defendant argues that Plaintiff's approach is "unreasonable" because it would have required Commerce to construct a value from an absence of evidence.  See Def.'s Resp. Br. at 16.   Yet, Commerce does not explain why the cost experiences of the [[          ]] collapsed fixed asset owners are good comparators for the transactions disregarded rule but not for the major input rule.

calculating accurate expense ratios.[19]   See id. at 28–31.   Defendant argues that

Commerce's decision is in accordance with law and supported by substantial evidence

because Simec neither withheld nor failed to produce any information that Commerce

---

[19] Plaintiff argues that Commerce should have applied "total adverse inferences to Simec" because Simec's reporting "obscured" the roles of various Simec affiliates involved in the production of rebar, "distorted and understated fixed asset expenses," and [[

                                                                                    ]].   See Pl.'s Br. at 26–31 (citation omitted).   Further, Plaintiff argues that Simec's overall approach to responding to Commerce's questionnaires led to the omission of the non-collapsed fixed asset owning companies' individual financial statements and the leases from the record. See id. at 33.

Parties and Commerce sometimes use the shorthand "adverse facts available" or "AFA" to refer to Commerce's reliance on facts otherwise available with an adverse inference to reach a final determination.   However, AFA encompasses a two-part inquiry pursuant to which Commerce must first identify why it needs to rely on facts otherwise available, and second, explain how a party failed to cooperate to the best of its ability so as to warrant the use of an adverse inference when "selecting among the facts otherwise available."   See 19 U.S.C. § 1677e(a)–(b). Commerce may, for example, rely on facts otherwise available when the information it requests is provided out of time or not in the "form or manner requested."   19 U.S.C. § 1677e(a)(2)(B). However, pursuant to 19 U.S.C. § 1677m(d), prior to resorting to facts otherwise available Commerce must, where practicable, provide the party with an opportunity to remedy or explain the identified deficiency.   If the party's response or remedy "is not satisfactory" or is submitted out of time, Commerce may "disregard all or part of the [interested party's] original and subsequent responses."   See 19 U.S.C. § 1677m(d).   The phrase "total adverse inferences" or "total AFA" encompasses a series of steps that Commerce takes to reach the conclusion that all of a party's reported information is unreliable or unusable and that as a result of a party's failure to cooperate to the best of its ability, it must use an adverse inference in selecting among the facts otherwise available.   Commerce may apply "total facts available" if it determines that none of the information provided is usable or reliable.   See Zhejiang DunAn Hetian Metal Co. v. United States, 652 F.3d 1333, 1348 (Fed. Cir. 2011) (citing Steel Auth. of India, Ltd. v. United States, 25 CIT 482, 485–89, 149 F. Supp. 2d 921, 926–29 (2001)).   Commerce may then apply an adverse inference in selecting among the facts otherwise available if it determines that a party failed to cooperate to the best of its ability.   See 19 U.S.C. § 1677e(a)–(b).   Accordingly, for Commerce to apply a "total adverse inference," or "total AFA" it must determine that all of a party's reported information is unreliable or unusable, and then determine that as a result of a party's failure to cooperate to the best of its ability, it must rely on an adverse inference in selecting among the facts otherwise available.

Here, Commerce used facts otherwise available to make an adjustment to the reported fixed overhead expenses to include certain omitted depreciation expenses, but concluded that an adverse inference was not warranted because Simec complied with Commerce's requests to the best of its ability.   See Final Decision Memo at 26–27; see also Final Calc. Memo at 2, Attach. I. Plaintiff's challenge, however, is not just to specific pieces of information, but is a more global challenge to the adequacy of Simec's cooperation and responses throughout the entirety of the review process.   Plaintiff alternatively challenges Commerce's determination not to apply facts otherwise available with an adverse inference to Simec's cost reporting.   See Pl.'s Br. at 31.

requested.  <u>See</u> Def.'s Resp. Br. at 17–23.  For the reasons that follow, Commerce's

decision not to apply total facts available to Simec, or facts otherwise available to Simec's

cost reporting is not supported by substantial evidence, and is remanded to the agency

for further explanation or reconsideration consistent with this opinion.

Under certain circumstances, Commerce may use facts otherwise available.  <u>See</u>

19 U.S.C. § 1677e(a).  Commerce shall use facts otherwise available to reach its final

determination when "necessary information is not available on the record," a party

"withholds information that has been requested by [Commerce]," fails to provide the

information timely or in the manner requested, "significantly impedes a proceeding," or

provides information Commerce is unable to verify.  <u>See id.</u>  However, prior to resorting

to facts otherwise available, Commerce must explain why the information it does have is

insufficient and provide, where practicable, the non-complying party an opportunity to

comply.  <u>See</u> 19 U.S.C. § 1677m(d).

In the final determination, Commerce explains that Simec responded "fully and

timely" to "all of the Department's questionnaires, including answering all questions

related to their corporate structure and identifying all producers of subject merchandise."

Final Decision Memo at 25 (citation omitted).  Commerce also explained that Simec's

reporting methodology reconciled any and all discrepancies caused by reporting on a

plant-based level, as opposed to a company-based level.  <u>See id.</u>  Finally, Commerce

explained that even though it agreed that Simec's reporting of fixed overhead expenses

required use of facts otherwise available to account for certain omitted depreciation

expenses related to fixed assets, application of an adverse inference was not warranted.

<u>See id.</u> at 26–27.

The court cannot sustain Commerce's determination not to apply facts otherwise available because Commerce's decision assumes that its collapsing analysis and its application of the transactions disregarded and major input rules are supported by substantial evidence and in accordance with law.  Pursuant to 19 U.S.C. § 1677e(a)(1), Commerce shall apply facts otherwise available if necessary information is missing from the record.  The fact that Commerce received everything it requested does not mean that information necessary to support Commerce's final determination was not missing from the record.   Commerce's contention that it was able to reconcile Simec's costs and understand Simec's corporate structure for collapsing purposes, see Final Decision Memo at 25–26, is based on an unsupported collapsing analysis.  See id. at 25–27.  As explained above, Commerce's decision not to collapse the six fixed asset owning companies is not in accordance with law and is not supported by substantial evidence. In deciding not to collapse the six fixed asset owning companies, Commerce did not evaluate the record in light of the 19 C.F.R. § 351.401(f)(2) criteria.  Further, Commerce's application of the transactions disregarded and major input rules cannot be sustained on the record before the court.  Commerce has not explained why the data it relied upon constituted a good comparator for the cost experiences of the non-collapsed fixed asset owning companies, nor has it explained why it valued a major input at cost. Consequently, in concluding that it did not need to resort to facts otherwise available, Commerce assumed necessary information was not missing from the record. Commerce's determination cannot be supported on this record, and is therefore remanded to the agency for further explanation or reconsideration consistent with this opinion.

IV.   **Commerce's Decision Not to Apply Adverse Inferences**

Plaintiff argues that Commerce should have applied total adverse inferences to calculate Simec's dumping margin, or in the alternative, adverse inferences to Simec's cost reporting.  <u>See</u> Pl.'s Br. at 31–38.  Defendant argues that record evidence does not indicate that Simec misreported information, was uncooperative, or engaged in tactics that resulted in necessary information being withheld from Commerce.  <u>See</u> Def.'s Resp. Br. at 17–23.  For the reasons that follow, the court cannot sustain Commerce's determination not to apply adverse inferences and the issue is remanded to the agency for further explanation or reconsideration consistent with this opinion.

Commerce will apply an adverse inference after deciding that use of facts otherwise available is warranted.  <u>See</u> 19 U.S.C. § 1677e(a).  Pursuant to 19 U.S.C. § 1677e(b), Commerce may apply an adverse inference if it "finds that an interested party has failed to cooperate by not acting to the best of its ability[.]"  19 U.S.C. § 1677e(b). "The statute does not provide an express definition of 'the best of its ability.'"  <u>Nippon Steel Corp. v. United States</u>, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  However, as <u>Nippon Steel</u> explained, a respondent acts to "the best of its ability" when it "do[es] the maximum it is able to do."  <u>Id.</u>

Here, Commerce determined that Simec's reporting methodology was not evasive, the costs reported were reconciled, and that it was able to adjust costs for the non-collapsed fixed asset holding companies pursuant to the transactions disregarded and major input rules.  <u>See</u> Final Decision Memo at 25–27.  Consequently, Commerce did not resort to total facts available to reach its final determination, and specifically determined that facts otherwise available with an adverse inference should not be used to calculate

either Simec's dumping margin generally or applied to Simec's cost reporting.[20]  See id.

at 27.  However, and as explained above, Commerce's decision not to use total or partial

facts available is not supported by record evidence.  Therefore, the court cannot sustain

Commerce's determination not to apply adverse inferences.  On remand, Commerce may

make a different determination or further explain its determination relying on evidence

available on the record and in a manner supported by the record.  Commerce may also

reopen the record and request further information.   Therefore, the court remands

Commerce's decision not to apply adverse inferences for further explanation or

reconsideration consistent with this opinion.

## CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Commerce's decision not to collapse the six fixed asset owning

companies is remanded for further explanation or reconsideration consistent with this

opinion; and it is further

**ORDERED** that Commerce's application of the transactions disregarded and

major input rules is remanded for further explanation or reconsideration consistent with

this opinion; and it is further

**ORDERED** that Commerce's decision not to use total facts available to calculate

Simec's dumping margin, or facts otherwise available to Simec's cost reporting is

---

[20] As stated above, Commerce did rely on facts otherwise available with respect to depreciation costs, but concluded that it would not apply an adverse inference.  See Final Decision Memo at 26–27.  However, Plaintiff is not challenging Commerce's decision to not apply AFA solely on the basis of Commerce needing to make an adjustment to account for certain omitted depreciation expenses.  See Pl.'s Reply Br. at 18.  Instead, Plaintiff makes a more global challenge based on its contention that throughout the review process Simec continually provided deficient responses.

**PUBLIC VERSION**

remanded for further explanation or reconsideration consistent with this opinion; and it is further

**ORDERED** that Commerce's decision not to apply adverse inferences is remanded for further explanation or reconsideration consistent with this opinion; and it is further

**ORDERED** that Commerce shall file its remand redetermination with the court within 90 days of this date; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file comments on the remand redetermination; and it is further

**ORDERED** that the parties shall have 30 days to file their replies to comments on the remand redetermination.


                              /s/ Claire R. Kelly
                              Claire R. Kelly, Judge

Dated:September 7, 2018
      New York, New York