Slip Op. 19-100

## UNITED STATES COURT OF INTERNATIONAL TRADE

REBAR TRADE ACTION COALITION,

     **Plaintiff,**

**v.**

**UNITED STATES,**

     **Defendant,**

**and**

**GRUPO SIMEC ET AL.,**

     **Defendant-Intervenors.**

**Before: Claire R. Kelly, Judge**

**Court No. 17-00184**
**PUBLIC VERSION**

## OPINION

[Sustaining the U.S. Department of Commerce's remand redetermination in the first administrative review of steel concrete reinforcing bar from Mexico.]

Dated: August 1, 2019

Alan Hayden Price, John R. Shane, and Maureen Elizabeth Thorson, Wiley Rein, LLP, of Washington, DC, for plaintiff, Rebar Trade Action Coalition.

Margaret Joy Jantzen, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant.  With her on the brief were L. Misha Preheim, Assistant Director, Jeanne E. Davidson, Director, and Joseph A. Hunt, Assistant Attorney General.  Of Counsel on the brief was Ian Andrew McInerney, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Rosa S. Jeong and Irwin P. Altschuler, Greenberg Traurig, LLP, of Washington, DC, for defendant-intervenors, Grupo Simec; Orge S.A. de C.V.; Compania Siderurgica del Pacifico S.A. de C.V.; Grupo Chant S.A.P.I. de C.V.; RRLC S.A.P.I. de C.V.; Siderurgica del Occidente y Pacifico S.A. de C.V.; Simec International 6 S.A. de C.V.; Simec International 7 S.A. de C.V.; and Simec International 9 S.A. de C.V.

Kelly, Judge:    Before the court is the U.S. Department of Commerce's ("Commerce") remand redetermination filed pursuant to the court's order in <u>Rebar Trade Action Coalition v. United States</u>, 42 CIT __, __, 337 F. Supp. 3d 1251, 1265 (2018) ("<u>Rebar</u>").  <u>See</u> Final Results of Redetermination Pursuant [<u>Rebar</u>] Ct. Remand, Apr. 8, 2019, ECF No. 75-1 ("<u>Remand Results</u>").

In <u>Rebar</u>, the court addressed Plaintiff, Rebar Trade Action Coalition's ("RTAC" or "Plaintiff") challenges to Commerce's final determination in the first administrative review of the antidumping duty ("ADD") order covering steel concrete reinforcing bar ("rebar") from Mexico.  <u>See</u> <u>Rebar</u>, 42 CIT at __, 337 F. Supp. 3d at 1255–65; <u>see also</u> Mem. Pl. [RTAC] Supp. Rule 56.2 Mot. J. Agency R. at 9–38, Dec. 14, 2017, ECF No. 27; <u>Steel Concrete Reinforcing Bar From Mexico</u>, 82 Fed. Reg. 27,233 (Dep't Commerce June 14, 2017) (final results of [ADD] admin. review; 2014–2015) ("<u>Final Results</u>") and accompanying Decision Mem. for the Final Results of [ADD] Admin. Review: Steel Concrete Reinforcing Bar from Mexico; 2014–2015, A-201-844, (June 7, 2017), ECF No. 19-5 ("Final Decision Memo"); <u>Steel Concrete Reinforcing Bar From Mexico</u>, 79 Fed. Reg. 65,925 (Dep't Commerce Nov. 6, 2014) ([ADD] order).  The court remanded for further explanation or reconsideration Commerce's (i) decision not to collapse six affiliates of Grupo Simec S.A.B. de C.V. and Orge S.A. de C.V.'s ("Simec"), the parent company, that owned fixed assets, but did not produce rebar ("non-collapsed group" or "non-collapsed companies"), <u>Rebar</u>, 42 CIT at __, 337 F. Supp. 3d at 1255–59, 1265; (ii) reliance on the cost experiences of the collapsed fixed asset owners to value the non-collapsed companies' fixed assets, <u>id.</u> at __, 337 F. Supp. 3d at 1259–62, 1265; and (iii) decision

not to apply total or partial facts available with an adverse inference to respondent.[1]  See

id. at __, 337 F. Supp. 3d at 1262–65.  For the reasons that follow, the court sustains the

Remand Results.

**BACKGROUND**

The court assumes familiarity with the facts of this case as discussed in the prior

opinion, Rebar, 42 CIT at __, 337 F. Supp. 3d at 1255, and here restates the facts relevant

to the court's review of the Remand Results.  The first administrative review of the subject

merchandise covered the period of April 24, 2014, through October 31, 2015, and

reviewed respondents Deacero S.A.P.I de C.V. and Simec.  See Initiation of Antidumping

and Countervailing Duty Administrative Reviews, 81 Fed. Reg. 736, 737 (Dep't

Commerce Jan. 7, 2016).

Pertinent here, in its final determination, Commerce collapsed Grupo Simec S.A.B.

de C.V., Orge S.A. de C.V., Compania Siderurgica del Pacifico S.A. de C.V., Grupo Chant

S.A.P.I. de C.V., RRLC S.A.P.I. de C.V., Siderurgica del Occidente y Pacifico S.A. de

C.V., Simec International 6 S.A. de C.V., Simec International 7 S.A. de C.V., and Simec

International 9 S.A. de C.V. ("Grupo Simec" or the "collapsed group"), and determined

that the companies should be treated as a single entity because record evidence showed

that there was a significant potential for manipulation of price or production.  See Final

Decision Memo at 31–32; Final Results, 82 Fed. Reg. at 27,234 n.10; see also Steel

Concrete Reinforcing Bar From Mexico, 81 Fed. Reg. 89,053, 89,053 n.5 (Dep't

---

[1] Although 19 U.S.C. § 1677e(a)–(b) (2015) and 19 C.F.R. § 351.308(a)–(c) (2016) each
separately provide for the use of facts otherwise available and the subsequent application of
adverse inferences to those facts, parties sometimes use the shorthand "adverse facts available"
or "AFA" to refer to its use of such facts otherwise available with an adverse inference.

Commerce Dec. 9, 2016) (prelim. results [ADD] admin. review; 2014–2015) ("Prelim.

Results") and accompanying Decision Mem. Prelim. Results of [ADD] Admin. Review:

Steel Concrete Reinforcing Bar from Mexico; 2014–2015 at 3–4, A-201-844, PD 127, bar

code 3527282-01 (Dec. 5, 2016).[2]  Commerce rejected RTAC's argument that the non-

collapsed companies should also have been collapsed because all owned fixed assets,

i.e., the facilities and production equipment used to produce rebar, and leased those fixed

assets to the collapsed companies.   See Final Decision Memo at 31–32; see also

[Commerce's] Final Results Sales & Cost Analysis Mem. at 2, CD 237, bar code 3579897-

01 (June 7, 2017) ("Final Calc. Memo").  For the Final Results, Commerce continued to

calculate a weighted-average dumping margin of 0.56% for Deacero S.A.P.I. de C.V. and

0.00% for Grupo Simec S.A.B. de C.V., as it had done in its preliminary determination.

See Final Results, 82 Fed. Reg. at 27,234; Prelim. Results, 81 Fed. Reg. at 89,053.

    In Rebar, the court remanded for further explanation or reconsideration

Commerce's (i) decision not to collapse six fixed asset owning companies affiliated with

Simec, (ii) application of the transactions disregarded and major input rules, (iii) decision

not to apply total facts available to calculate Simec's dumping margin, or facts otherwise

available to Simec's cost reporting, and (iv) decision not to apply adverse inferences to

calculate Simec's dumping margin.  Rebar, 42 CIT at __, 337 F. Supp. 3d at 1265.

---

[2] On September 1, 2017, Defendant filed indices to the public and confidential administrative
records underlying Commerce's final determination.  These indices are located on the docket at
ECF No. 19-2–3.  On April 11, 2019, Defendant filed indices to the public and confidential
administrative records underlying the remand portion of these proceedings. The indices to the
remand redetermination are located on the docket at ECF No. 77-2–3.  Citations to administrative
record documents in this opinion are to the numbers Commerce assigned to such documents in
the indices.

Commerce filed the <u>Remand Results</u> on April 8, 2019.  On remand, Commerce reopened the record and collected further information on the management, business operations, and ownership of the companies in the non-collapsed group and determined that record evidence did not demonstrate a significant potential for manipulation that would warrant collapsing under 19 C.F.R. § 351.401(f)(2) (2016).[3]  <u>Remand Results</u> at 7–12.  Regarding the application of the transactions disregarded rule, Commerce conceded that "it may not be reasonable to assume" that experiences of the non-collapsed fixed asset holders mirrored those of the collapsed fixed asset holders and revised its methodology.  <u>Id.</u> at 16.  Commerce explains it was able to derive company-specific general and administrative expenses ("G&A") for all the non-collapsed companies relying either solely on Grupo Simec's audited consolidated financial statements and underlying consolidated worksheets, or on a combination of the consolidated financial statements and information solicited during the remand proceedings.  <u>See id.</u> at 16–18.  Finally, Commerce reasoned that it did not need to rely on facts available or adverse inferences because it had all the information it needed to conduct the collapsing analysis and was no longer estimating the non-collapsed companies' costs.  <u>Id.</u> at 18.

In its reply to comments on remand, Defendant, for the first time, challenged RTAC's standing to bring this action.  Def.'s Resp. Comments on [Remand Results] at 11–12, July 1, 2019, ECF No. 90 ("Def.'s Resp. Comments"); <u>see also</u> U.S. Const. art. III, § 2, cl. 1.  The court requested supplemental briefing to provide all parties with the opportunity to be heard on the issue.  Ct.'s Letter at 2, June 11, 2019, ECF No. 86.  All parties complied with the court's request.  <u>See generally</u> [RTAC's] Suppl. Br., June 18,

---

[3] Further citations to Title 19 of the Code of Federal Regulations are to the 2016 edition.

2019, ECF No. 87 ("RTAC's Suppl. Br."); Def.'s Resp. [RTAC's] Suppl. Br., July 1, 2019,

ECF No. 91 ("Def.'s Suppl. Resp. Br."); Def.-Intervenors' Resp. Pl.'s Suppl. Br., June 24,

2019, ECF No. 88 ("Def.-Intervenors' Suppl. Resp. Br.").

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of

1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012)[4] and 28 U.S.C. § 1581(c)

(2012).  Commerce's antidumping determinations must be in accordance with law and

supported by substantial evidence.  19 U.S.C. § 1516a(b)(1)(B)(i).  "The results of a

redetermination pursuant to court remand are also reviewed 'for compliance with the

court's remand order.'"  Xinjiamei Furniture (Zhangzhou) Co. v. United States, 38 CIT __,

__, 968 F. Supp. 2d 1255, 1259 (2014) (quoting Nakornthai Strip Mill Public Co. v. United

States, 32 CIT 1272, 1274, 587 F. Supp. 2d 1303, 1306 (2008)).

## DISCUSSION

### I.   Standing

The Court has "exclusive jurisdiction" over claims commenced under 19 U.S.C.

§ 1516a.  28 U.S.C. § 1581(c) (2012).  The party seeking the Court's jurisdiction has the

burden of establishing that jurisdiction exists.  See Norsk Hydro Can., Inc. v. United

States, 472 F.3d 1347, 1355 (Fed. Cir. 2006) (citing Kokkonen v. Guardian Life Ins. Co.

of Am., 511 U.S. 375, 377 (1994)).  The Constitution constrains the federal courts'

jurisdiction to cases which involve "actual cases or controversies."  Simon v. E. Ky.

---

[4] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.  Citations to 19 U.S.C. § 1677e, however, are to the unofficial U.S. Code Annotated 2018 edition, which reflects the amendments made to 19 U.S.C. § 1677e by the Trade Preferences Extension Act of 2015.  See Trade Preferences Extension Act of 2015, Pub. L. No. 114-27, 129 Stat. 362 (2015).

<u>Welfare Rights Org.</u>, 426 U.S. 26, 37 (1976) ("No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."); <u>see</u> U.S. Const. art. III, § 2, cl. 1.  "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III."  <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992).  To establish standing, plaintiff must demonstrate that its claim represents an "injury in fact."  <u>Id.</u>  An "injury in fact" is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical[,]" "fairly traceable to the challenged action," and "likely" to be "redressed by a favorable decision."  <u>Id.</u> at 560–61 (citation omitted).  Accordingly, regardless of a statutory grant of jurisdiction, a federal court must dismiss as non-justiciable any claim that fails to meet Article III criteria.

RTAC challenges three aspects of Commerce's final determination, all of which are interconnected.  In addition to challenging Commerce's collapsing analysis and, if it should lose on that count, Commerce's application of the transactions disregarded rule,[5] RTAC is also claiming that Commerce's decision not to apply total-AFA, in light of the respondent's conduct and existing gaps in information, is not in accordance with law and is unsupported by substantial evidence.  Pl. [RTAC's] Comments on [Remand Results] at 3–31, May 9, 2019, ECF No. 80 ("Pl.'s Comments").  RTAC contends that if it is successful on its total-AFA claim, Commerce would be prompted to select the investigation rate, 66.70%, as Simec's rate.  RTAC's Suppl. Br. at 4–5.  Further, it contends that if the presently non-collapsed fixed asset owners were collapsed, Commerce would be forced

---

[5] RTAC challenges Commerce's application of both the transactions disregarded and major input rules.  <u>See</u> Pl.'s Comments at 19–27.  Commerce, however, did not rely on the major input rule here.  <u>See</u> <u>infra</u> note 22; <u>see</u> <u>Remand Results</u> at 14–18.

to confront the fact that these companies' individual financial statements are not on the record. See id. at 4, 7. RTAC contends that the statements will be necessary to calculate a rate for the expanded collapsed entity. Id. at 4–5. The production of such records, or lack thereof, RTAC argues, would likely change Commerce's calculation of costs for the expanded collapsed entity or trigger Commerce's reliance on 19 U.S.C. § 1677e(a) or (b), or both. Id. at 4–7.

RTAC has standing to challenge Commerce's determination. Commerce's decision whether to resort to the remedies available in 19 U.S.C. § 1677e is subject to review by this Court. That RTAC may ultimately be unsuccessful in its claim is of no moment. RTAC's claim is that Commerce's decision not to apply total-AFA results in a rate that fails to compensate for the ill-effects of Simec's unfair trade practices. RTAC's injury, therefore, is Commerce's decision not to apply AFA.

Defendant argues that because RTAC's requested form of relief would, in fact, lower the respondent's cash deposit rate, RTAC fails to allege a material injury. Def.'s Resp. Comments at 12; Def.'s Resp. Suppl. Br. at 2–4; see also 19 U.S.C. § 1673d(b). Defendant's standing challenge ignores RTAC's AFA challenge and wrongly presumes that a zero cash deposit for an expanded collapsed entity is a given. The court cannot simply accept as true Defendant's contention that the zero cash deposit rate will remain unchanged even if the presently non-collapsed fixed asset owning companies were collapsed. Def.'s Resp. Comments at 12; Def.'s Suppl. Resp. Br. at 2–3. It is possible that in calculating costs for the expanded entity, Commerce will need to solicit further information and/or rely on facts otherwise available and possibly, if the circumstances call for it, apply an adverse inference to those facts. The court cannot base a standing

determination on the probability of a party's success on the merits.  If the basis for standing was tied to success on the merits, parties would often be foreclosed from challenging Commerce's decisions.[6]

Defendant-Intervenors confine their jurisdictional challenge to the purported mootness of RTAC's collapsing claim.  See Def.-Intervenors' Comments Supp. [Remand Results] at 18–19, June 10, 2019, ECF No. 85.  Defendant-Intervenors argue that because, on remand, Commerce accounted for all rebar-related costs the companies in the non-collapsed group incurred, even if the companies were collapsed, no additional costs would be uncovered as to affect respondent's weighted-average dumping margin and related cash deposit rate.  Id. at 19.  Commerce, according to the Defendant-Intervenors, effectively collapsed the relevant companies.  Id.  The argument is unpersuasive for the same reasons Defendant's standing arguments fail.  At the root of RTAC's collapsing claim is that Commerce, in carrying out 19 C.F.R. § 351.401(f)(2), wrongly determined that information necessary to its analysis was on the record and that respondent's actions did not warrant application of adverse inferences.  Success on either count could alter the resulting weighted-average dumping margin.  RTAC has, therefore, alleged an economic injury that can be redressed by this Court's order and this Court has jurisdiction over that claim pursuant to 28 U.S.C. § 1581(c) (2012).

---

[6] Defendant-Intervenors also addressed Defendant's standing challenge.  Defendant-Intervenors argue that RTAC's AFA-based standing is speculative and hypothetical and that it is highly improbable that Commerce, after determining on two prior occasions that respondent was cooperative and its actions not warranting an application of adverse inferences, would change course and resort to partial- or total-AFA if it decided to collapse the non-producers.  See Def.-Intervenors' Suppl. Resp. Br. at 3–5.  The argument is unpersuasive.  Past conduct is not indicative of future conduct.  Further, it is speculative to argue that information already on the record will be sufficient to calculate costs for the expanded entity and that AFA, in any of its forms, will not be needed.

## II.    Not Collapsing the Non-Producing Fixed Asset Holders

Plaintiff argues that Commerce's continued decision not to collapse six non-producing fixed asset owning companies is unsupported by substantial evidence. <u>See</u> Pl.'s Comments at 3–12.   Plaintiff also argues that Commerce misinterprets and misapplies prior precedent to support its redetermination. <u>See id.</u> at 12–18.   Defendant argues that Commerce's determination is in accordance with law and is supported by substantial evidence because the record does not show that the potential for manipulation was significant. <u>See</u> Def.'s Resp. Comments at 4–11, 13–22; <u>see also</u> 19 C.F.R. § 351.401(f).   For the following reasons, Commerce's collapsing analysis on remand complies with the court order, is in accordance with law and supported by substantial evidence, and is therefore sustained.

In <u>Rebar</u>, the court remanded for further explanation or reconsideration Commerce's decision not to collapse six non-producing fixed asset owning companies. <u>See</u> <u>Rebar</u>, 42 CIT at __, 337 F. Supp. 3d at 1265.   The court determined that Commerce acted contrary to law by not conducting a collapsing analysis under 19 C.F.R. § 351.401(f)(2) for the six companies and that its determination was unsupported by substantial evidence because it did not address detracting record evidence.[7]  <u>Id.</u> at __, 337 F. Supp. 3d at 1255–59.

Commerce's regulation permits it to

---

[7] Specifically, the court identified evidence showing that the non-collapsed and collapsed companies overlap in terms of ownership and managerial structures, the non-collapsed companies leased fixed assets that were used to produce subject merchandise during the period of review to the collapsed companies at [[          ]],  and the collapsed and non-collapsed companies engaged in a variety of intercompany transactions suggestive of intertwinement of operations. <u>Rebar</u>, 42 CIT at __, 337 F. Supp. 3d at 1257–59; <u>see also</u> <u>Universal Camera Corp.</u> <u>v. NLRB</u>, 340 U.S. 474, 488 (1951) (noting that "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.").

**PUBLIC VERSION**

> treat two or more affiliated producers as a single entity where those producers have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities and [Commerce] concludes that there is a significant potential for the manipulation of price or production.

19 C.F.R. § 351.401(f)(1).[8]  In assessing whether there is a "significant potential for the manipulation of price or production," Commerce may consider:

> (i)  The level of common ownership;
>
> (ii) The extent to which managerial employees or board members of one firm sit on the board of directors of an affiliated firm; and
>
> (iii) Whether operations are intertwined, such as through the sharing of sales information, involvement in production and pricing decisions, the sharing of facilities or employees, or significant transactions between the affiliated producers.

19 C.F.R. § 351.401(f)(2).   Although the regulatory language speaks of collapsing producers, Commerce, through practice, has extended collapsing to non-producers under certain circumstances and upon consideration of the factors set out in 19 C.F.R. § 351.401(f)(2).  See [Commerce's] Affiliation & Collapsing Mem. for the Grupo Simec at 6 & n.26, PD 131, bar code 3528081-01 (Dec. 5, 2016); see, e.g., Issues & Decision Mem. for the [ADD] Investigation of Certain Frozen and Canned Warmwater Shrimp from Brazil at 14, A-351-838, (Dec. 23, 2004), available at https://enforcement.trade.gov/frn/summary/brazil/04-28110-1.pdf (last visited Aug. 1, 2019) ("Brazilian Shrimp").

---

[8] If affiliated producers are collapsed, those companies may be considered a single entity. Collapsing entities allows sales of one collapsed entity to be considered sales of the other for purposes of Commerce's dumping margin calculation.  See 19 C.F.R. § 351.401(f); 19 U.S.C. § 1677b.

On remand, Commerce applies the 19 C.F.R. § 351.401(f)(2) factors to the non-collapsed companies, further explains its practice to collapsing non-producers, and determines that the six companies should not be collapsed.  Remand Results at 7–12. Commerce concludes that transferring production to the non-collapsed companies would necessitate an additional work force and substantial retooling/reorganization of the existing fixed assets.  See id. at 23–25, 30–33; see also 19 C.F.R. § 351.401(f)(1). Commerce's reliance on intertwined operations, as determinative of whether the non-collapsed companies' potential for manipulation of price or production is significant, is reasonable and consistent with Commerce's practice of evaluating the collapsibility of non-producers.

Commerce, relying on several prior determinations, explains that its practice of extending 19 C.F.R. § 351.401(f)(2) beyond "the four corners of the regulation to affiliated non-producing exporters and distributors" is triggered when evidence shows that the non-producer could shift sales or production to evade antidumping duties.  Remand Results at 6.  In these prior determinations, Commerce appears to rely less upon the companies' overlapping ownership and/or managerial structures, i.e., factors in 19 C.F.R. § 351.401(f)(2)(i) and (ii), and more upon whether operations between the companies are sufficiently intertwined to find a present ability to shift sales or production, i.e., the third factor in 19 C.F.R. § 351.401(f)(2)(iii), to evade antidumping duties.  See Brazilian Shrimp at 13–15 (collapsing a non-producing affiliate where the non-producing company maintained a fully operational production facility on the producer's premises, the producer participated in pricing and production decisions, and the two shared sales information); Issues & Decision Mem. Final Affirmative Determination & Final Negative Critical

Circumstances Determination in the Less-Than-Fair Value Investigation of Certain

Carbon & Alloy Steel Cut-To-Length Plate from the Republic of Korea at 25–27, A-580-

887, (Mar. 29, 2017) available at http://ia.ita.doc.gov/frn/summary/korea-south/2017-

06631-1.pdf (last visited Aug. 1, 2019) ("Korean Plate") (concluding that a producer could

shift production and/or sales to its distributors that purchased significant amounts of the

producer's merchandise, but themselves neither produced nor resold the merchandise).[9]

Commerce's practice to collapse non-producers with producers when it finds

sufficiently intertwined operations, leading to an ability to shift sales or production to

---

[9] The remand redetermination also invokes Malaysian Nails, where Commerce concluded that collapsing was necessary because the parent company drastically changed its trading patterns by funneling all of its U.S. sales through a subsidiary and publicly announced that the change was intended to avoid a high cash deposit rate. Remand Results at 28, 42–43 (citing Issues & Decision Mem. Final Results [ADD] Changed Circumstances Review of Certain Steel Nails from Malaysia at 6–12, A-557-816, (July 14, 2017), available at http://ia.ita.doc.gov/frn/summary/malaysia/2017-15518-1.pdf (last visited Aug. 1, 2019) ("Malaysian Nails")). By contrast, Commerce contends there is no evidence on this record that the non-collapsed companies had plans to sell or produce rebar themselves. Id. at 28, 42. In Malaysian Nails, Commerce sought to initiate a changed circumstances review based on evidence of purported evasion of an existing ADD order by a parent and one of its subsidiaries. Malaysian Nails at 9–12. However, as the reviewing court explained, Commerce's evidence was in fact a "misstatement of otherwise lawful activity" and "not a pronouncement of an impending fraudulent export scheme," because Commerce issued two separate rates to the two companies at issue, despite requests from those companies that they be collapsed. See Inmax Sdn. Bhd. v. United States, 41 CIT __, __, 277 F. Supp. 3d 1367, 1372–73 (2017). Commerce's reliance on Malaysian Nails is misplaced and does not aid this court in evaluating the collapsing analysis done here.

Further, RTAC challenges Commerce's reliance on Hontex to establish the parameters for what future "significant" manipulation under 19 C.F.R. § 351.401(f) entails and attempts to distinguish the case. See Pl.'s Comments at 15–16; Remand Results at 26; see also Hontex Enters. v. United States, 27 CIT 272, 298–99, 248 F. Supp. 2d 1323, 1345–46 (2003). Neither parties' characterization of Hontex helps the court evaluate the collapsing analysis here. In that case, the reviewing court remanded, three times, Commerce's collapsing analysis for failure to support with substantial evidence its conclusions that the operations of two exporters were intertwined and there was a relationship of control. Hontex, 27 CIT at 299–300, 248 F. Supp. 2d at 1345–47; Hontex Enters. v. United States, 28 CIT 1000, 342 F. Supp. 2d 1225, 1234–38, 1246–47 (2004); Hontex Enters. v. United States, 29 CIT 1096, 387 F. Supp. 2d 1353 (2005). Further, Commerce ultimately reversed its decision to collapse. Hontex Enters. v. United States, 30 CIT 353, 355–57, 425 F. Supp. 2d 1315, 1318–19 (2006).

evade antidumping duties, Remand Results at 6; see, e.g., Brazil Shrimp at 13–15;

Korean Plate at 25–27, is reasonable.   Commerce's regulation limits collapsing to

affiliated producers.  19 C.F.R. § 351.401(f).  Commerce's concern is that there may be

a "significant potential for the manipulation of price or production" where two affiliated

producers share ownership, management, and/or have intertwined operations.

Specifically, 19 C.F.R. § 351.401(f) confronts the possibility that affiliated producers may

shift production or sales in order to evade antidumping duties.  By practice, and explained

above, Commerce extended the reach of 19 C.F.R. § 351.401(f) to non-producers under

limited circumstances.  When considering the possibility of shifting production or sales to

non-producers, Commerce asks whether the non-producer could nonetheless behave

like a producer.  Commerce's practice has been to treat a non-producer as capable of

acting like a producer when its operations are sufficiently intertwined with those of a

producer.  It is always possible for a non-producer to become a producer or a seller of the

subject merchandise.  Commerce's practice reasonably assesses whether because of

intertwined operations a non-producer can presently act as a producer and, as a result,

significantly manipulate sales or production.  Given the regulatory language that asks

whether there is "significant potential for the manipulation of price or production,"

Commerce's practice is reasonable.

In its analysis, Commerce concedes that the collapsed and non-collapsed groups

"unquestionably" overlap in management and common ownership but explains that the

overlap is "not instructive" because record evidence "does not suggest that a single

company or organized collective of those companies with centralized direction has the

ability to control the combination of assets necessary to produce subject merchandise."

Remand Results at 9; see also 19 C.F.R. § 351.401(f)(2)(i)–(ii).   Instead, Commerce

evaluates whether the non-collapsed companies could significantly manipulate price or

production and facilitate the shifting of sales or production because their operations are

intertwined.   Remand Results at 10–12, 37–41.   RTAC contends that Commerce's 19

C.F.R. § 351.401(f)(2) analysis is intrinsically flawed because it treats the non-collapsed

companies as independent of the parent company's control.[10]   Pl.'s Comments at 7–12.

As a result, RTAC contends, Commerce fails to consider the parent company's ability to

leverage its ownership interests in and managerial oversight of the non-collapsed

companies to exercise top-down control to manipulate sales or production of the subject

merchandise.   Id. at 9–12.   Commerce acknowledges that it may be hypothetically

possible for the non-collapsed fixed asset owners to become producers themselves.

Remand Results at 11–12.   However, it explains that evidence on this record does not

show that the non-collapsed companies could, or made plans to, overcome the barriers

to entry—hiring a work force,[11] retaining a customer base and establishing sales

---

[10] Specifically, RTAC contends that because the parent exercises centralized direction and unilateral control over all assets—machinery, labor, and sales—necessary to produce and sell the subject merchandise, the fact that the production process is distributed among [[      ]] plants, owned by [[                    ]], both collapsed and non-collapsed, is inconsequential; the parent owns and manages all the relevant companies.   See Pl.'s Comments at 9–10, 15.   As a result, RTAC argues, Commerce wrongly assumes the non-collapsed companies would need to expend additional monies to acquire all the machinery and workforce necessary to produce rebar, as opposed to simply having the parent siphon all the necessary resources to the non-collapsed companies.   Id.

[11] RTAC argues that the non-collapsed companies would not need to hire new workers because they could, as the collapsed producers do, [[
                                    ]].   See Pl.'s Comments at 9 (citing [Simec's] Section A Resp. at Exs. A-6d, A6-f, A6-h, A6-j, A6-k, A6-l, CD 4–5, bar code 3443871-01–02 (Feb. 22, 2016) (contending the cited exhibits show that at least [[     ]] of the collapsed producers engaged in [[                        ]] practices)).   Again, RTAC asks the court to reweigh the evidence and basis its challenge on the presumption that the parent company will shift production from the collapsed to the non-collapsed companies.   Commerce's determination that, on this record, any shifts in employment are speculative is not unreasonable.

relationships, and reorganizing or acquiring all the fixed assets necessary to produce.[12]

Id. at 10–12, 28–29, 31–32.  Finally, although Commerce did identify "significant" transactions between the collapsed and non-collapsed companies,[13] Commerce discounted them because none pertained to the business of producing or selling rebar.[14]

Id. at 11.  On this record, Commerce's determination that operations between the collapsed and non-collapsed companies were not sufficiently intertwined to indicate a significant potential for manipulation of price or production is reasonable.

## III.  Commerce's Application of the Transactions Disregarded Rule

In Rebar, the court remanded for further explanation or reconsideration Commerce's (i) decision to use the cost experiences of certain collapsed fixed asset owners that produced rebar to revise the costs of non-collapsed fixed asset owners that

---

[12] RTAC argues that it was unreasonable for Commerce to conclude that the non-collapsed companies were affirmatively barred from using or accessing the fixed assets solely on the assurances of the mandatory respondent.  Pl.'s Comments at 10.  Commerce's determination was reasonable.  First, record evidence does not show that during the period of review the non-collapsed companies produced or sold rebar.  Remand Results at 10, 31.  Second, RTAC's challenge presumes the parent's malintent based on its ownership interests in and managerial oversight of the non-collapsed companies.  Record evidence does not support such speculation.

[13] During the period of review, the collapsed and non-collapsed companies had the following transactions between them— [[
                                                                                                                                                                                  ]].  Remand Results
at 11.

[14] RTAC contends that during the period of review the collapsed and non-collapsed companies transacted for [[                                                                                                                ]], which
were [[                                                                                                        ]].  See Pl.'s Comments at 10–11 & n.8
(citing [Simec's] Section A, B, & D Suppl. Questionnaire Resp. at Exs. D-26A, D-26B, D-26E,CD 133–35, bar code 3504495-01–03 (Sept. 7, 2016) (identifying specific transactions between the collapsed and non-collapsed companies for purchase or sale of the items identified)).  RTAC argues these transactions were related to the production of rebar and constitute intertwined operations supportive of collapse.  Id.  Evidence on the record does not identify the [[
                                     ]] as rebar or [[                                                                              ]].  Remand
Results at 25, 37–39.  Further, evidence on this record shows that the non-collapsed companies did not report costs of sales during the period of review and no evidence indicates that they produced or sold rebar.  Id. at 25–26, 28, 37–39.  Commerce's decision that the transactional evidence RTAC identifies did not support collapsing the relevant companies is reasonable.

did not produce and (ii) Commerce's decision to value the leases at cost.  See Rebar, 42

CIT at __, 337 F. Supp. 3d at 1259–62, 1265.

On remand, Commerce (i) revises its methodology by recalculating the non-collapsed fixed asset owning companies' G&A costs using actual costs and (ii) further explains why it valued the leases at cost.  Remand Results at 16–17.  Commerce explains it was able to extract actual G&A costs from the consolidated worksheets underlying Grupo Simec's audited consolidated financial statements, already on the record, for [[      ]] of the six non-collapsed companies.  Id.  For the remaining non-collapsed companies,[15] Commerce reopened the record and solicited further relevant information. Id. at 17.  To account for various costs and expenses revealed during the remand proceedings, Commerce made three revisions.  It recalculated the remaining non-collapsed companies' G&A costs using information provided on remand in conjunction with the consolidated worksheets.  Id.  It amended its transactions disregarded calculation to include certain expenses and incomes the remaining non-collapsed companies incurred.[16]  Id. at 17, 46–48.  Finally, it revised Grupo Simec's overall G&A expense ratio using neutral facts available to account for services an affiliate freight supplier[17] provided to Grupo Simec and which record evidence suggests involved shipments of intermediate

---

[15] The remaining non-collapsed fixed-asset owning companies are [[

]].

[16] Specifically, Commerce accounted for [[

]].  Remand Results at 47–48.

[17] The affiliate supplier referenced is [[                                        ]].  Remand Results at 49.

goods or raw materials.[18]  Id. at 49–50.[19]  Commerce's use of actual costs complies with the court's remand order and is reasonable.  Therefore, its application of the transactions disregarded rule is sustained.

To derive the actual cost of the fixed asset leases on remand, Commerce applies the non-collapsed companies' individual G&A expense ratios to their respective depreciation expenses.[20]  Remand Results at 17–18.  Commerce complies with the

---

[18] RTAC challenges Commerce's valuation of the freight services.  Pl.'s Comments at 24–25.  Specifically, it argues that Commerce failed to apply the transactions disregarded rule and that Commerce should have applied an adverse inference, instead of valuing the service using [[                        ]] unrecovered cost of shipping services for 2015, i.e., its net operating loss, as neutral facts available.  Id.; see also Remand Results at 49–50.  Given that Commerce resorted to neutral facts available, it is reasonably discernable that information necessary to value [[                                                  ]] freight services was missing from the record.  To apply an adverse inference, Commerce must identify how a respondent failed to cooperate to the best of its ability in providing the missing information.  See 19 U.S.C. § 1677e(b); Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  Here, Simec disclosed [[           ]] as a freight service provider delivering subject merchandise in the home market in its initial questionnaire responses and Commerce did not, until the remand questionnaire, seek clarification about this service.  Remand Results at 49–50.  Simec complied with the request for more information.  Id.  Commerce's decision not to apply an adverse inference, in light of Simec's actions, is reasonable.  Further, given that the decision to apply the transactions disregarded rule is within Commerce's discretion, 19 U.S.C. § 1677b(f)(2), and there was no evidence on this record on the market value or actual transfer price for the freight service, Commerce's decision to use [[                              ]] net operating losses was not unreasonable.

[19] RTAC argues that Commerce's revised G&A ratio for Grupo Simec wrongly omits certain net unrecovered costs [[                        ]] and [[                        ]] incurred.  Pl.'s Comments at 25–26.  Defendant contends that Plaintiff failed to exhaust this challenge before the agency.  Def.'s Comments at 32–33.  The [[       ]] companies listed, along with non-collapsed fixed asset owners [[                              ]], are subsidiaries of [[                              ]], itself a Simec affiliate.  [Simec's] Suppl. Questionnaire Resp. on Remand at 6, CRR 2, bar code 3775333-01 (Nov. 14, 2018).  In its comments to the draft remand results, RTAC only makes arguments as to [[                              ]] and does not delineate why the net unrecovered costs of the [[       ]] other subsidiaries should be part of Grupo Simec's overall G&A expense ratio calculations.  See RTAC's Comments on Draft Results of Remand Redetermination at 31–33, CRR 18, bar code 3803020-01 (Mar. 8, 2019).  RTAC had access to both the draft redetermination analysis memorandum and the draft remand results.  If RTAC believed that the costs of those [[       ]] subsidiary companies, which are not part of either the collapsed or non-collapsed groups, were important to include, RTAC should have raised the issue with Commerce.  RTAC failed to exhaust this argument and cannot raise it now.

[20] The leases were provided at [[       ]].  See Final Calc. Memo at 2.

court's remand order and explains that actual cost is a "reasonable approximation of market value for purposes of [its] transactions disregarded analysis[,]"[21] id. at 17,[22] and that it does not add a fictitious value for profit to the actual cost.  Id. at 48–49; see also 19 U.S.C. § 1677b(f)(2).  In applying the transactions disregarded rule, Commerce's practice is to adjust the transfer price for the service or input at issue so that it reflects the market price.  See, e.g., Issues & Decision Mem. for the Final Affirmative Determination in the Less than Fair Value Investigation of Certain Cold-Rolled Steel Flat Products from Brazil at 38, A-351-843, (July 20, 2016), available at http://ia.ita.doc.gov/frn/summary/brazil/2016-17951-1.pdf (last visited Aug. 1, 2019) (explaining that Commerce has an "express preference for market value" and will look to "any reasonable source for market value" if respondent's own purchases or an affiliate's sales are not available (citations omitted)).  Commerce has expressed a preference for how to establish market value.  Remand Results at 14–15, 48 & n.168.  First, it looks at whether respondent purchased the input from an unaffiliated supplier; if unavailable, it

---

[21] In calculating normal value, Commerce may revise prices between affiliates using the transactions disregarded rule if Commerce determines that the reported prices are below market value. 19 U.S.C. § 1677b(f)(2). Here, Commerce determined that the [[      ]] leases between the collapsed and non-collapsed fixed asset owning companies were below market value and applied the transactions disregarded rule. Remand Results at 17.

[22] Commerce did not, as RTAC avers, value the [[      ]] leases using both the transactions disregarded and major input rules. See, e.g., Pl.'s Comments at 20. Commerce only relied on the transactions disregarded rule here. See Remand Results at 17. The decision to apply either rule is within Commerce's discretion, 19 U.S.C. § 1677b(f)(2),(3), which means that Commerce decides whether a given input is a "major" input. No evidence on this record demonstrates that Commerce's decision to rely solely on the transactions disregarded rule to value leases was unreasonable. Further, to the extent that RTAC challenges Commerce's determination that actual cost can be a "reasonable approximation of market value," Remand Results at 17, Pl.'s Comments at 23–24, because it contradicts Commerce's implicit recognition, in its regulation, that cost of production and market price cannot be the same value, 19 C.F.R. 351.407(b) (stating that a major input will be the "higher of the price paid, the market price, or the cost of producing it), the challenge is unpersuasive. RTAC wrongly assumes that Commerce applied, and was required to apply, the major input rule.

looks to sales of the input between an affiliate supplier and an unaffiliated party, and as

a final resort, to a reasonable source for market value available on the record.  Id.  Grupo

Simec did not lease fixed assets from unaffiliated suppliers and the non-collapsed fixed

asset owners did not lease their fixed assets to an unaffiliated party.  Id. at 15.

Commerce, accordingly, looked for and selected as a reasonable source the actual cost

it calculated for the leases.  Id.  It is not Commerce's practice to add profit when

constructing market value and it has only done so on one prior occasion.  See Huvis Corp.

v. United States, 32 CIT 845, 849 (2008) (explaining that Commerce was able to calculate

profit for each of two major inputs at issue relying on financial statements of the affiliated

supplier).  Commerce also explains that because the leases were provided at [[

]],  the only available source from which to derive profit would be the experiences of the

collapsed fixed asset owners.[23]  The collapsed fixed asset owners are producers and it

was reasonable for Commerce to decline to rely on their experiences.  Therefore,

Commerce's decision to value the fixed asset leases at cost and not construct a fictious

value for profit is reasonable.

RTAC's challenges to the accuracy and completeness of Grupo's Simec's financial

documents, Pl.'s Comment at 20–27, are speculative and unpersuasive.  RTAC

speculates that because some Grupo Simec affiliates originally booked depreciation

---

[23] RTAC argues that Commerce's inability to construct a value for profit indicates that respondent failed to act to the best of its ability in providing necessary information and constitutes a reason for application of an adverse inference.  Pl.'s Comment at 23–24.  Simec disclosed the [[
]]  lease arrangement, Final Calc. Memo at 2, and, on remand, responded to Commerce's additional questions about the terms of the leases.  Remand QR Resp. at 5–6.  Commerce does not have a practice for constructing a value for profit and the record does not indicate that Commerce asked for such information.  To impose an adverse inference, Commerce must first identify what information is missing from the record.  There is no information missing on the record which would serve as basis for Commerce resorting to facts otherwise available.  Remand Results at 48–49.  It therefore would have been unreasonable to apply an adverse inference here.

expenses as part of their G&A expenses and not their cost of goods sold ("COGS"),[24] there is reason to doubt the completeness and accuracy of the costs the non-collapsed companies disclosed.  Id. at 20.  There is no evidence on this record indicating that the non-collapsed companies booked depreciation expenses as part of their G&A expenses, as opposed to their COGS, or that the costs reported were false.  Further, Grupo Simec's auditors isolated depreciation expenses booked as G&A expenses and reclassified them as COGS for purposes of Grupo Simec's consolidated financial statements.  Remand Results at 47.  RTAC also speculates that because Commerce had to revise [[

]]  G&A costs to account for income and expenses revealed on remand, the G&A costs of the other [[     ]] non-collapsed companies must be similarly incomplete.  Pl.'s Comments at 22.  The consolidated worksheets break out each subsidiary's COGS, depreciation expenses, and G&A expenses, and those values reconcile with the "respective line items reported on Grupo Simec's fiscal year 2015 audited consolidated financial statements." Remand Results at 17, 46–47.  The worksheets provided such costs for the six non-collapsed companies.  Commerce, however, revised [[                         ]] G&A costs because its costs were reported as part of a much larger Simec affiliate, [[

]],  and therefore did not reflect the [[     ]] companies' individual cost experiences.  Remand Results at 17, 47.  By contrast, the consolidated worksheets did capture the individual depreciation expenses, cost of goods sold, and G&A expenses of the [[     ]] other non-collapsed companies.  Id. at 16–17.  No record evidence suggests

---

[24] Commerce derives company-specific G&A ratios by dividing a company's G&A costs by its cost of goods sold.  Depreciation expenses are accounted for in a company's COGS.

that where the consolidated worksheets provide company-specific cost experiences,

those experiences are incomplete.[25]  Finally, RTAC speculates that [[

]] had COGS during the period of review that were unreported.  Pl.'s Comments

at 22–23.  Evidence on this record, however, indicates that Grupo Simec's reported

COGS for its affiliates—[[                               ]]— reconciles with the COGS amount reported in

the audited consolidated financial statement— [[                            ]].  [Simec's] Suppl.

Questionnaire Resp. on Remand at Ex. 7, CRR 6, bar code 3775333-04 (Nov. 14, 2018).

## IV.    Commerce's Decisions that Simec Cooperated and Provided All Information Necessary for the Determination

RTAC enumerates various reasons for why Commerce, in its collapsing and

transactions disregarded and major input rules analyses,[26] should have resorted to

adverse facts available.  Pl.'s Comments at 27–31.  RTAC's challenge, therefore,

presumes and depends on this court remanding the results of either or both of those

analyses.  The court, for the reasons provided above, sustains Commerce's <u>Remand</u>

---

[25] RTAC also argues that Commerce did not explain the presence of certain "substantial line items" in the consolidated worksheets it used to extract the [[      ]] non-collapsed companies' actual costs.  Pl.'s Comments at 20–23 (citations omitted) (referring to entries for "[[

]]").  RTAC claims these line items are unrelated to the [[    ]] non-collapsed companies' individual expenses.  <u>Id.</u> at 22.  Defendant contends that Plaintiff failed to exhaust this challenge before the agency.  Def.'s Comments at 30–31.  In the draft remand results, Commerce revealed that it would extract actual G&A costs of [[    ]] non-collapsed fixed asset owning companies using consolidated worksheets.  <u>See</u> Draft Results of Redetermination Pursuant [Rebar] Ct. Order at 15–16, CRR 8, bar code 3798800-01 (Mar. 1, 2019).  RTAC, therefore, had the opportunity to raise the existence of these line items to Commerce, but did not, and is prevented from doing so before the court.

[26] Although RTAC frames its argument as a challenge to Commerce's application of both the transactions disregarded and major input rules, as explained above, Commerce did not rely on the major input rule here.  Instead, to value the [[      ]] leases, Commerce applied the transactions disregarded rule.  <u>See</u> <u>Remand Results</u> at 14–18.

Results and associated decisions not to resort to facts otherwise available or apply partial-

or total-AFA.

## CONCLUSION

For the foregoing reasons, the Remand Results are sustained.  Judgment will enter

accordingly.


                       /s/ Claire R. Kelly   
                      Claire R. Kelly, Judge

Dated: August 1, 2019  
         New York, New York